UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| COTY SHANE SMITH, | ) | |
|---|---|---|
| Petitioner, | ) | |
| v. | ) | No.: 3:21-CV-163-DCLC-HBG |
| STATE OF TENNESSEE, | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Coty Shane Smith, a prisoner in the custody of the Tennessee Department of Correction, has filed a federal habeas petition pursuant to 28 U.S.C. § 2254 challenging the legality of his confinement under a Monroe County judgment of conviction for second-degree murder. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court finds that no evidentiary hearing is warranted, and the petition should be denied.[1]

**I.  SUMMARY OF RELEVANT EVIDENCE AND PROCEDURAL HISTORY**

Petitioner — along with Lorenz James Freeman, Jr., Joshua Lee Steele, and Jessica Rayne Payne — was indicted for felony murder and conspiracy to commit aggravated robbery in connection with the March 2012 robbery and murder of Luther "Luke" Vineyard [Doc. 13-1 p. 3-5]. Freeman and Steele were also indicted for aggravated robbery, and Payne was indicted for criminal responsibility for aggravated robbery [*Id.* at 3-4]. On July 1, 2013, Petitioner pleaded

---

[1] An evidentiary hearing is only appropriate in a § 2254 action where review of the record demonstrates that a petitioner might be entitled to relief if given an opportunity to prove the factual allegations raised in the petition. *See* Rules Governing § 2254 Cases, Rule 8(a); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

guilty to one count of second-degree murder in exchange for the dismissal of the remaining charges [*Id*. at 9-11, 16-17].

At Petitioner's sentencing hearing on July 31, 2013, the State announced the factual basis underlying the guilty plea as follows:

> [O]n March the 4th, 2012, that Mr. Freeman, [Defendant] and Ms. Payne had an attempt to go and rob the victim in this case, a Mr. Vineyard. That they went to his place of residence, that the female, Ms. Payne, stayed in the vehicle and the two gentlemen get out. That they approached his residence when another vehicle shows up and they get spooked and leave and so there's no event that happens at that point. They go to a residence where they get hold of Mr. Steele. At that point, sometime later on, and Ms. Payne does not return with them, but Mr. Freeman, [Defendant], and Mr. Steele go back to Mr. Vineyard's residence, and at that point they go in [wearing masks] and it is Mr. Freeman and Mr. Steele who are the ones that hold on to the victim Mr. Vineyard and he's hit in the head with a piece of iron, a piece of wrought iron, and eventually dies—
> ....
> [Defendant] was involved in the planning, [Defendant] goes through the house, the house is ransacked looking for what we expect they were looking for cash, there were some rumors going around that the victim Mr. Vineyard had a large amount of cash that was there. After this happens[,] they leave, go back, and there's some other conversations that go[] on. Fortunately[,] law enforcement gets on top of this thing fairly quickly and does a[n] outstanding job of investigating the case and statements are taken from Mr. Freeman and Mr. Steele, and Ms. Payne that would support the facts that I've outlined to the court.

*State of Tennessee v. Coty Shane Smith*, E2014-00490-CCA-R3-CD, 2014 WL 7399332, at *1 (Tenn. Crim. App. Dec. 26, 2014) (footnote omitted), *perm. app. denied* (Tenn. Apr. 13, 2015) ("*Smith I*"). Petitioner's guilty plea was accepted [Doc. 13-1 p. 9].

On September 20, 2013, Petitioner filed a motion to withdraw his guilty plea [Doc. 13-2, p. 18]. Trial counsel later filed a motion to withdraw, maintaining that representing Petitioner on the motion to withdraw the guilty plea was likely a conflict of interest since the motion was based, in part, on an allegation that trial counsel did not adequately provide Petitioner with information

2

to make a knowledgeable decision about the entry of the plea [*See, e.g.,* Doc. 13-2, p. 41-61].[2] Counsel's motion to withdraw was denied [*Id*. at 61].

Thereafter, a hearing was held on the motion to withdraw the guilty plea [*Id*. at 64-104]. Petitioner explained that he never admitted that he intended to cause injury or death to the victim, or that he actually inflicted injuries to the victim [*Id*. at 70-71]. Additionally, he informed investigators that he did not understand how he could be responsible for the death of someone when he did not perform the acts that resulted in the death [*Id*.]. However, Petitioner admitted on cross-examination that he was present during the robbery and understood after conversations with counsel that he could be responsible for someone else's actions in the perpetration of a felony [*Id*. at 84-85]. Essentially, Petitioner explained that he had a "change of heart" after pleading guilty due to his lack of involvement in the circumstances leading to the victim's death [*Id*. at 72-74].

The trial court resolved the motion against Petitioner [*Id*. at 104]. Specifically, the court noted that Petitioner had not asserted actual innocence, had not expressed confusion or misunderstanding of the plea's terms, had not entered the plea hastily, and had not argued that he entered the plea under duress [*Id*. at 97-104]. Instead, the court found, Petitioner "woke up" in fear of the possible sentence to be imposed and merely changed his mind [*Id*. at 100-01].

Petitioner's case was set for sentencing [*Id*. at 106]. The Tennessee Court of Criminal Appeals ("TCCA") recounted the following testimony from the sentencing hearing:

> Detective Captain Doug Brandon of the Monroe County Sheriff's Department testified. Detective Captain Brannon testified that he was the lead investigator in the case. He explained that law enforcement responded to a call at the home of the victim. A neighbor reported that he found the victim dead in his home. Detective Captain Brannon described the home as a small log cabin that "had been pretty well ransacked ... as if someone was searching for something." The "walls had been torn apart, flooring had been ripped up."

---

[2] The Court notes that the motion to withdraw does not appear in the technical record.

3

Detective Captain Brannon explained that the victim had a visible head wound and the autopsy later revealed he had been struck in the head several times with a hard object. The autopsy also indicated that "positional asphyxiation," or an inability to move his body, was a "contributing factor" to the victim's death.

Officers received information during the investigation that led to the defendants. Mr. Steele was approached by officers and was cooperative, describing the events as "a planned robbery." Mr. Steele explained that he was not initially involved in the robbery. Defendant, Ms. Payne, and Mr. Freeman went to the victim's home to rob him and were interrupted when someone came to the house unexpectedly. They abandoned the plan and went to Mr. Steele's house, which was located a few miles away from the victim's home. Mr. Steele was brought into the conspiracy at that point and returned to the victim's home with Mr. Freeman and Defendant. Ms. Payne stayed with Mr. Steele's girlfriend at the home of Mr. Steele.

When the men arrived at the home of the victim, they kicked in the door, restrained the victim with "flexicuffs" or "flex-cuffs," and Mr. Steele beat the victim with a piece of "rebar," a "piece of steel normally used to reinforce concrete." The men tore the house apart looking for narcotics and money.

Detective Captain Brannon described Defendant as the "least cooperative" of the individuals involved in the incident. When investigators spoke with Defendant, he "pretty much denied everything." Detective Captain Brannon testified that Defendant "placed himself out of the picture ... he placed himself as having not made any physical contact with the victim, having not done anything but perhaps being present." However, Detective Captain Brannon explained that the victim's home was very small and that he "would find it hard to believe that any one person anywhere in that house was not aware of what was going on in that front room, either visually, verbally, or audi[torily]...."

****

Defendant explained his involvement in the offense. He admitted that he went to the home of the victim with the purpose of robbing the victim. However, Defendant stated injuring the victim or using a weapon were not part of the plan. The plan was to restrain the victim by placing "flexi-cuffs" on him. Defendant did not anticipate that the victim would be injured. In fact, Defendant explained that they had no intention of harming the victim and that the men disguised themselves prior to the robbery so that they would not be recognized by the victim. Defendant testified that he did not know that the victim had been injured until after they left the victim's home and returned to Mr. Steele's house.

*Smith I*, 2014 WL 7399332, at **2-4.

After applying the relevant enhancement factors, which included Petitioner's leadership role in the offense, the exceptional cruelty shown the victim during the commission of the offense, and the fact that Petitioner was on probation at the time of the robbery and murder, the trial court sentenced Petitioner to serve a term of 25 years in the custody of the Tennessee Department of Correction [Doc. 13-3 p. 132-36]. Petitioner's conviction and sentence were affirmed on appeal. *Smith I*, 2014 WL 7399332. The Tennessee Supreme Court denied discretionary review on April 13, 2015. *Id*.

Aggrieved, Petitioner filed a petition for post-conviction relief, later twice amended by appointed counsel, alleging that he received the ineffective assistance of counsel [Doc. 13-10 p. 4-25; 30-32; 75-78]. The TCCA summarized Petitioner's post-conviction evidentiary proceedings as follows:

> At the December 2019 evidentiary hearing, trial counsel testified that he was appointed to represent the petitioner in June 2012. After receiving discovery materials from the State, counsel met with the petitioner at the jail to review the evidence. Included in the discovery materials were video recordings of the petitioner's and co-defendants' incriminating interviews with law enforcement officers. Trial counsel acknowledged that the petitioner could not view those materials because no computer was available at the jail and because he did not bring a laptop with him. He also did not make copies of the video recordings for the petitioner to keep and attempt to view later. Counsel met with the petitioner at the jail several other times but made no effort to bring a laptop on his subsequent visits. Counsel stated, however, that the petitioner "was aware of the contents" of the recordings because they included the petitioner's own statement and because he was provided with summaries of the interviews.
>
> In coordination with the other defense attorneys, trial counsel moved to suppress the incriminating statements by the petitioner and the co-defendants, which motion was denied. He moved for interlocutory appeal on the matter. Prior to the resolution of the interlocutory appeal, the State presented a plea offer, a condition of which was that the petitioner "waive any appellate rights."
>
> Trial counsel described his trial preparation as consisting of "dealing with the evidence that the State was going to introduce against" the petitioner. He considered hiring an investigator for the case, but ultimately decided against it, although he could not remember why. Counsel was aware of Detective Brannon's past conduct

5

that could be used for impeachment but said that Detective Brannon's interactions with the petitioner "were somewhat tangential" because the petitioner's interviews were conducted by Tennessee Bureau of Investigation ("TBI") agents. Counsel could not recall whether the petitioner had named any potential witnesses that he wanted counsel to interview, but in January 2013, the petitioner mentioned that he was at Walmart at the time of the offense, and counsel made a note to himself to look into the matter. Counsel acknowledged that he did not attempt to obtain any video footage from Walmart, explaining that, in his experience, "Walmart does not keep video for more than ... [90] days." He also noted that the petitioner did not mention this alibi in his statement to the police. Counsel did not seek an independent autopsy because "the wounds to ... the victim's head were pretty self[-]explanatory." He also did not seek independent analysis of a shoe print found at the crime scene because the TBI's analysis of the print was inconclusive as to the petitioner.

****

Trial counsel received the plea offer from the State in early June and relayed the information to the petitioner on June 11. He explained to the petitioner the terms of the offer and his sentencing exposure if he should be convicted at trial. Counsel recalled that the petitioner had difficulty understanding the concept of felony murder, asking "how he could be guilty of murder if he was not the one who inflicted the ... injuries" to the victim. Counsel stated that he was confident that the petitioner understood the proceedings and the implications of a guilty plea, but the petitioner continued to question how he could be convicted for murder. The petitioner did not immediately accept the plea offer and requested his discovery materials. Counsel met with the petitioner on June 19 at the jail and gave the petitioner all discovery materials, although the petitioner still did not have the ability to view the video recordings. Counsel also gave the petitioner a letter that memorialized the discussion that they had on June 11. Before counsel met with the petitioner, he learned that all the other co-defendants were accepting plea offers. Counsel explained to the petitioner that the co-defendants would likely testify against him if he went to trial and advised him to accept the plea offer because he was otherwise facing a life sentence. Counsel also explained to the petitioner that accepting the plea offer would require that he give up certain rights, including his right to the interlocutory appeal that was pending.

****

The petitioner testified that he had asked trial counsel to investigate "[a]libi issues, location issues, [and] text message issues," asserting that security footage from Walmart would have shown that he was at the store at the time of the offenses. He asserted that text messages between him and co-defendant Freeman would show that co-defendant Steele had returned to the crime scene after the robbery. The petitioner stated that counsel failed to do any investigation other than review the discovery materials despite the petitioner's telling him of other potential suspects

6

and potentially exonerating statements by witnesses. The petitioner said that he wanted counsel to seek additional analysis of the footprint found at the scene to potentially prove that it belonged to someone else. He also said that counsel failed to tell him that he could request funds to hire an investigator or expert witness to aid in the defense. He asserted that counsel was focused on the potential felony murder conviction rather than "actually investigating the facts of the case" and developing a theory of defense for trial.

The petitioner said that he was unable to view certain electronic discovery materials prior to entering his plea because, although he asked counsel to bring a computer to the jail, counsel never did so. The petitioner stated that upon review of those materials sometime later, he discovered numerous issues that would have caused him to reject the plea offer and go to trial. The petitioner said that, during his plea submission hearing, he "didn't understand anything to do with the actual court" and that he did not know at that time that trial counsel had not done what he should have in his representation. The petitioner consented to counsel's moving to withdraw prior to the plea withdrawal hearing because he believed that counsel had a conflict of interests. He stated that counsel was not prepared for the hearing and had not provided him with the questions that counsel intended to ask or the standards the petitioner had to meet to succeed on the motion.

The petitioner stated that he had asked counsel to call his grandmother and great uncle as witnesses at the sentencing hearing, and although both were present at the hearing, counsel failed to call them and did not explain why. Counsel wrote the petitioner a letter, stating that it was not worthwhile to pursue an appeal of the denial of his motion to withdraw as counsel or the motion to withdraw the guilty plea, but he did not explain why he would not pursue those issues. Counsel did not meet with the petitioner after the sentencing hearing to prepare the appeal, and the petitioner stated that he was not given an opportunity to participate in his appeal. The petitioner pursued a pro se appeal because counsel "told me he wasn't gonna file an appeal." He did not receive a copy of the appellate brief until after it was filed. The petitioner contended that counsel's conflict of interests persisted through the appeals process, and, accordingly, counsel did not provide adequate representation.

During cross-examination, the petitioner acknowledged that he told the police that he planned the robbery, kicked in the victim's door, and saw co-defendant Steele hit the victim with a lead pipe, but he stated that little physical evidence tied him to the scene. He was aware that counsel sought to have his incriminating statements suppressed. The petitioner recalled that, at his plea withdrawal hearing, he testified that he "had a change of heart" about his plea and should not have been convicted of second[-]degree murder because he did not take part in the victim's death. He acknowledged that the fear and duress that he claimed caused him to plead guilty stemmed from the sentencing exposure he faced if convicted at trial.

\*\*\*\*

At the close of the evidence, the post-conviction court accredited trial counsel's testimony over that of the petitioner and made findings of fact on the record.

\*\*\*\*

In its written order denying relief, the post-conviction court concluded that the petitioner failed to establish that counsel's failure to appeal the denials of the motion to withdraw as counsel and the motion to withdraw the guilty plea and continuing representation despite a conflict of interests constituted deficient performance. The court determined, at any rate, that the petitioner failed to establish that he was prejudiced by counsel's performance. As to the claim that counsel failed to sufficiently investigate the case, the court concluded that because the petitioner failed to present what evidence counsel could have discovered with additional investigation at the post-conviction hearing, he could not prevail on that claim. Additionally, the court concluded that counsel's decision to forgo the use of an investigator or expert witness was a reasonable, tactical decision. Although the court found that trial counsel's failure to facilitate the petitioner's viewing of the electronic discovery materials constituted deficient performance, the court concluded that the petitioner failed to establish that he was prejudiced by counsel's actions.

*Smith v. Tennessee*, E2019-00963-CCA-R3-PC, 2020 WL 5642161, at \*\*2-5 (Tenn. Crim. App. Sept. 22, 2020), *perm. app. denied* (Tenn. Feb. 4, 2021). The TCCA affirmed the judgment of the post-conviction court. *Id*. The Tennessee Supreme Court thereafter denied discretionary review. *Id*.

Petitioner filed his federal habeas petition on or about April 30, 2021, raising the following issues, as paraphrased by the Court:

> Ground I: Whether Detective Brannon was "not post-certified to be a detective" in Tennessee and committed perjury in his application for hire.
>
> Ground II: Whether Detective Brannon "fabricat[ed] evidence coaching witnesses to lie to gain an indictment."
>
> Ground III: Whether the original warrant serving as the basis for the foundation of the investigation was concealed.

8

[Doc. 2]. The Court ordered Respondent to respond to the petition [Doc. 6], and Respondent filed a motion to dismiss due to Petitioner's failure to exhaust his State-court remedies prior to filing suit [Doc. 19]. Specifically, Respondent argued that Petitioner filed a writ of error coram nobis with the Monroe County Criminal Court that was still pending at the time Petitioner filed his habeas action [Doc. 20 p. 2; *see also* Doc. 27-5]. This Court denied Respondent's motion, stayed this action, and held the petition in abeyance pending the resolution of Petitioner's proceedings in State court [Doc. 23]. Petitioner's writ of error coram nobis was denied by the State court on September 23, 2021 [Doc. 27-5]. This Court subsequently lifted its stay and ordered Respondent to file a response to the petition [Doc. 25]. Thereafter, Respondent filed an answer, and Petitioner filed a handwritten letter captioned "Supplemental Evidence"[3] [Docs. 28 and 29]. This matter is ripe for review.

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a state court unless that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

---

[3] Petitioner did not seek leave to supplement or amend his petition prior to filing his "Supplemental Evidence," which was filed after Respondent's answer [Doc. 29]. To the extent the "Supplemental Evidence" attempts to raise new claims not presented in Petitioner's initial federal habeas petition [Doc. 29], such claims are not properly before the Court and will not be addressed further. *See, e.g., Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (finding argument first presented in traverse rather than petition was not properly before district court, and therefore, district court did not err in declining to address it).

9

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). This standard will allow relief on a federal claim decided on its merits in state court only where the petitioner demonstrates that the state ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state-court's factual findings unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by the doctrine of procedural default. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust his available State remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and

adequate basis for the dismissal. *See, e.g., Coleman*, 501 U.S. at 731-32, 735 n.1; *Gray*, 518 U.S. at 161-62; *see also Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013).

A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749-750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). A fundamental miscarriage of justice of occurs only "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Such a claim requires a "petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In this context, actual innocence "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

## III. ANALYSIS

### A. Ground I

Petitioner states that Detective Brannon "was never legally [POST[4]] certified in the State of Tennessee" under Tenn. Code Ann. § 39-16-302(a)[5], and therefore, "the evidence he collected and entered was inadmissible in court" [Doc. 2 at 5; *see also* Doc. 12 p. 42].

---

[4] The Court assumes Petitioner is referring to the "Peace Officer Standards & Training Commission (P.O.S.T.)," which serves "as the primary regulatory body for Tennessee law enforcement." *See* Tennessee Department of Commerce and Insurance, https://www.tn.gov/commerce/post.html (last visited January 27, 2022).

[5] The statute provides that "[i]t is unlawful for any person who is not licensed to do so, to practice or pretend to be licensed to practice a profession for which a license certifying the qualifications of the licensee to practice the profession is required." Tenn. Code Ann. § 39-16-302.

11

Petitioner's argument fails to identify any actual violation of federal or constitutional law as necessary to present a cognizable federal habeas claim. *See* 28 U.S.C. § 2254(a) (allowing writ to be entertained "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States"). Even if the Court were to liberally construe this argument as presenting a general appeal to constitutional principles, such generality is insufficient to state a constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) ("We have also indicated that it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."); *see also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding "general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated") (citation and internal quotation marks omitted); *McDougald v. Lockhart*, 942 F.2d 508, 510 (8th Cir. 1991) ("Explicit citation to the Constitution or to a federal case is necessary for fair presentation of a constitutional claim in state court."). Therefore, this allegation fails to present a federal or constitutional claim.

Moreover, Petitioner's argument is based on a purported error of State law, and such errors fail to raise a cognizable federal habeas claim. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus.").

Additionally, to the extent this claim is cognizable and was presented in Petitioner's coram nobis proceedings, it is procedurally defaulted. The trial court found that the applicable statute of limitations barred the petition, as it was not filed with one year of the judgment becoming final as

required under Tennessee law [Doc. 27-5 p. 3].  *See* Tenn. Code Ann. § 27-7-103 ("The writ of error coram nobis may be had within one (1) year after the judgment becomes final[.]").  The State's application of this statute of limitations has been consistently found "an independent and adequate state ground for denying [a] claim." *See, e.g., Harbison v. Bell*, No. 1:97-cv-52, 2007 WL 128954, at *4 (E.D. Tenn. Jan. 16, 2007), *aff'd*, 503 F.3d 566 (6th Cir. 2007), *rev'd on other grounds*, 556 U.S. 180 (2009); *Carson v. Genovese*, No. 3:15-cv-01121, 2021 WL 1564764, at *16 (M.D. Tenn. Apr. 21, 2021).  Therefore, the claim is procedurally defaulted, and Petitioner has not established the requisite cause, prejudice, or fundamental miscarriage of justice to excuse this default.

Accordingly, the Court finds this claim is not cognizable on federal habeas review, and it is otherwise procedurally defaulted.

### B. Ground II

Petitioner next argues that newly discovered evidence shows that Detective Brannon both fabricated evidence and coached a witness "to lie to gain an indictment" [Doc. 2 p. 11-12].

The factual basis of this claim is unclear.  Regardless, Petitioner fails to identify any actual violation of constitutional or federal law to allow this Court to consider his claim.  *See* 28 U.S.C. § 2254(a).  Additionally, to the extent this claim is cognizable and was presented in Petitioner's coram nobis proceedings, it is procedurally defaulted by the State court's application of the relevant statute of limitations, as set forth in Ground I, *supra* [Doc. 27-5 p. 3].  *See also* Tenn. Code Ann. § 27-7-103; *Carson*, 2021 WL 1564764, at *16.  Petitioner has not established the requisite cause, prejudice, or fundamental miscarriage of justice so as to excuse this default.  Therefore, this claim is not cognizable on federal habeas review, and it is otherwise procedurally defaulted.

C. **Ground III**

Finally, Petitioner challenges his conviction on the basis that the "[o]riginal warrant used for the foundation of the investigation was concealed and said never existed" [Doc. 2 p. 13]. The Court liberally construes this as a claim that the State violated the mandate of *Brady v. Maryland,* 373 U.S. 83, 87 (1964) (holding "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

Petitioner first presented the factual basis underlying a *Brady* claim in his coram nobis proceedings [Doc. 27-1 p. 3]. But, as the Court explained in Ground I, *supra*, Petitioner's coram nobis petition was denied on independent and adequate State law grounds [Doc. 27-5 p. 3]. *See also* Tenn. Code Ann. § 27-7-103; *Carson*, 2021 WL 1564764, at *16. Petitioner has not argued a fundamental miscarriage of justice to excuse this default.

The Court notes, however, that a state's suppression of *Brady* evidence may constitute "cause" under the procedural default doctrine. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). To establish a *Brady* claim, a petitioner must show that the State withheld evidence favorable to the accused and material to either the petitioner's guilt or punishment. *Brady*, 373 U.S. at 87. The Supreme Court has articulated "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks and citation omitted). "A reasonable probability is a probability

14

sufficient to undermine confidence in the outcome" of the proceeding.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks and citation omitted).

Here, Petitioner has not presented any evidence that the State suppressed any exculpatory evidence.  First, "a *Brady* violation does not occur when 'the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source.'"  *See Stojetz v. Ishee*, 892 F.3d 175, 206 (6th Cir. 2018) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).  Petitioner admits that the State provided the evidence purportedly suppressed by acknowledging that the allegedly withheld warrant was found by him "years later" after he "review[ed] [the] contents of [his attorney's own discovery] file" [Doc. 2 p. 8].

Second, Petitioner fails to present any argument showing how he would have "used the [allegedly] withheld evidence to conduct further discovery, to question witnesses at trial differently, or to further develop his theory of the case."  *See Hogan v. Welch*, No. 4:08-cv-2539, 2010 WL 300798, at *4-5 (N.D. Ohio Jan. 19, 2010) (rejecting habeas claim where petitioner did not demonstrate "that the evidence was favorable, aside from asserting that he found it to be pertinent to his defense").

Finally, Petitioner fails to show that admission of this additional evidence at a trial may have resulted in a different judgment since Petitioner pled guilty and conceded the facts underlying the indictment in this case.  Accordingly, Petitioner has failed to establish any exception that would permit review of this defaulted claim, and it will be dismissed.

### IV.  CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief.  28 U.S.C. § 2253(c)(1).  A COA will not issue

15

unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

## V. CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**SO ORDERED:**

s/Clifton L. Corker
United States District Judge